IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **PSM Farms, LLC, Stratton K. Murphy, a Partner Other Than Tax Matters Partner,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CASE NO. 06-246T** |
| | § | **Chief Judge Edward J. Damich** |
| **United States of America,** | § | |
| | § | |
| **Defendant.** | § | |

**AMENDED JOINT PRELIMINARY STATUS REPORT**

Pursuant to the Rules of the United States Court of Federal Claims ("RCFC"), Appendix A, paragraph 4 and the Honorable Judge Damich's Special Procedures Order filed on September 14, 2006 ("Special Order") and the Order filed September 26, 2006, the Parties file this Amended Joint Preliminary Status Report.

**(a) Jurisdiction.**

This is a TEFRA partnership action for the readjustment of partnership items of PSM Farms, LLC (the "Partnership") for tax year ending December 27, 2000. The Parties agree that the Court has jurisdiction under 28 U.S.C. § 1508, which affords the Court of Federal Claims jurisdiction to render judgment upon a petition for the readjustment of partnership items under 26 U.S.C. § 6662.

**(b) Case Consolidation.**

The Parties anticipate that this case will be consolidated with the following cases before this Court: *Murphy Pork Partners, LLC*, Case No. 06-247T, and *MURFAM Farms, LLC*, Case No. 06-245T. The Parties have already agreed to coordinate discovery over these cases, among others, as discussed in ¶ (d) below.

In accordance with the Court's Order of August 23, 2006, the Parties will appear for a telephonic Preliminary Status Conference at 11:00 a.m. on October 4, 2006, to discuss the consolidation of this matter with *Murphy Pork Partners, LLC*, Case No. 06-247T, and *MURFAM Farms, LLC*, Case No. 06-245T, as well as the coordination of discovery of these three cases with *JZ Buckingham Investments, LLC*, Case No. 05-231 T.

**(c) Bifurcation of Liability and Damages**.

There is no issue for trial as to damages insofar as this is a TEFRA partnership action in which jurisdiction is expressly limited to the readjustment of partnership items of the Partnership. *See* 26 U.S.C. § 6226(e). Subject to the foregoing, Harry D. Murphy, Marc. D. Murphy, and Stratton K. Murphy (collectively, the "Taxpayers") have deposited with the Internal Revenue Service (the "IRS") the following amounts, which represent the amount of tax and interest due from each of them should the Notice of Final Partnership Administrative Adjustments ("FPAA") issued to the Partnership be upheld: $3,275,710, $1,440,000, and $1,440,000, respectively.

**(d) Deferral, Transfer, Remand and Related Cases**.

The Parties do not anticipate any proceedings to be deferred pending consideration of another case before this Court or any other tribunal. Also, the Parties are not aware of any basis for transferring or remanding the case to another tribunal.

The Parties are aware, however, of the following cases, wherein the IRS has challenged transactions similar to the transactions at issue in this case: (1) (A) *Murphy Pork Partners, LLC*, Case No. 06-247T, (B) *MURFAM Farms, LLC*, Case No. 06-245T, and (C) *JZ Buckingham Investments, LLC*, Case No. 05-231T, all of which are before this Court; and (2) the cases in *In re COBRA Tax Shelters Litigation*, M.D.L Docket No. 9727, which are before the United States

District Court for the Southern District of Indiana Indianapolis Division (collectively, inclusive of this case, the "Cases").

*In re COBRA Tax Shelters Litigation*, M.D.L Docket No. 9727 ("MDL"), Defendant moved the district court to enlarge discovery for the number of depositions and interrogatories in those cases and to set global limits by which Defendant agreed it would be bound across all the Cases. The Honorable William T. Lawrence granted Defendant's motion, in part, enlarging the *total* number of depositions for each party to 99 and the number of interrogatories *per case* to 100.

Subsequently in *JZ Buckingham Investments, LLC*, Case No. 05-231T, the parties recommended that this Court increase the number of interrogatories and depositions consistent with the MDL court's order. Defendant represented to the Court that the discovery limits sought in the MDL were intended to apply to all of the Cases. This Court adopted the parties' recommendation and allowed each party 100 interrogatories and allowed an increased number of depositions, provided that the total number of depositions taken across all of the Cases by each party did not exceed 99.

Likewise, the Parties recommend that this Court adopt the global discovery limits set by the MDL court and permit each party 100 interrogatories and up to an aggregate of 99 depositions across all of the Cases. To date, Defendant has taken 6 of its 99 depositions. Plaintiffs have not taken any of their 99 depositions.

The Office of the United States Attorney for the Southern District of New York has a pending criminal investigation with respect to these transactions. Plaintiff's counsel does not believe the investigation involves the Taxpayers in this case, and that the Taxpayers have fully cooperated with the IRS. That office has asked that it be kept apprised of any discovery in this

action in order to ensure that this action does not adversely affect its pending criminal investigations. In the event that it does, Defendant anticipates that it will seek either a protective order, or other such relief, including a stay if necessary, to protect the important interests of law enforcement. Counsel for Defendant has notified Plaintiff that, in addition to Rule 6(e) of the Federal Rules of Criminal Procedure which protects grand jury information, the IRS criminal files are also privileged and not subject to discovery at this time.

**(e)** **Removal or Suspension**.

Not applicable.

**(f)** **Joinder of Additional Parties**.

Pursuant to 26 U.S.C. § 6226(c)(1), each person who is a partner of the Partnership for tax year ending December 27, 2000 is deemed to be a party to this action. For these purposes, *partner* is defined under 26 U.S.C. § 6231(a)(2) as any partner in the Partnership and any other person whose income tax liability under subtitle A is determined in whole or in part by taking into account directly or indirectly partnership items of the Partnership.

At this time, neither Party anticipates that any additional party will be joined, except to the extent that the Court consolidates this matter with the cases discussed in part (b); provided, however, in the event the IRS issues a statutory notice of deficiency for the 2000 taxable year for non-partnership items to the individual Taxpayers, the Taxpayers may file a claim for refund and move for joinder or consolidation of the related lawsuit.

The IRS recently assessed a 40% penalty against the Taxpayers related to the transactions at issue. The individual Taxpayers intend to pay the penalty, file a claim for refund, and assuming the claim is denied, file a refund suit and move to join or consolidate that suit with this

case. Defendant takes the position that Taxpayers' suits could not be properly joined or consolidated with this case.

**(g) <u>RCFC 12(b), 12(c) or 56 Motion</u>.**

Plaintiff intends to file separate motions for partial summary judgment pursuant to RCFC 56 on the grounds that Treasury Regulations §§ 1.752-6 (the "752 Regulation") and 1.701-2 (the "701 Regulation"), upon which Defendant partially bases its adjustments, are invalid on their face and/or as applied to the Transactions (later defined).

Plaintiff's challenge to the 752 Regulation will be based, in part, on the following:

1) Section 309 of the Community Renewal Tax Relief Act of 2000 (the "2000 Act") authorizes the Treasury to adopt rules strictly for the purpose of preventing the acceleration or duplication of losses. The 752 Regulation improperly goes beyond the scope of this authority.

2) Section 309 of the 2000 Act authorizes the adoption of rules similar to those in 26 U.S.C. § 358(h), but only with respect to transactions involving partnership shareholders rather than to transactions involving purely partnerships. The 752 Regulation improperly extends the 26 U.S.C. § 358(h) rules to transactions involving only partnerships.

3) The 752 Regulation improperly denies the exceptions set forth in 26 U.S.C. § 358(h) to Notice 2000-44 transactions.

4) The 752 Regulation should not be upheld under the general authority vested in the Treasury to adopt regulations set forth in 26 U.S.C. § 7805(a).

5) The 752 Regulation improperly applies retroactively, and alternatively, does not retroactively apply against the Partnership's assumption of the Short Options (later defined), which occurred before August 11, 2000. *See Klamath Strategic Investment Fund LLC v. U.S.*, 98 AFTR 2d ¶2006-5179 (E.D. Tex. 2006) (holding that the 752 Regulation is not valid retroactively for liabilities assumed before August 11, 2000, the date upon which Notice 2000-44 was issued).

6) The 752 Regulation represents an impermissible use of rulemaking authority drafted solely for the purpose of bolstering the IRS' litigating position with respect to Notice 2000-44 transactions.

Plaintiff's challenge to the 701 Regulation will be based on the following:

1) The 701 Regulation exceeds the Treasury's authority under Subchapter K of the Internal Revenue Code (the "Code") and general rule-making authority under 26 U.S.C. § 7805.

2) The 701 Regulation violates the separation of powers doctrine.

3) The 701 Regulation is unconstitutionally vague.

Plaintiff anticipates filing these motions after discovery is completed regarding the Treasury Regulations. Plaintiff's counsel is aware of at least one other case in which the Defendant prepared extensive privilege logs in response to a discovery request regarding the same Treasury Regulations. Plaintiff expects Defendant will use the same strategy in this case, and plans to challenge Defendant's claim of privilege. Based on the foregoing, Plaintiff does not anticipate filing the motions for partial summary judgment regarding the Treasury Regulations until, at the earliest, April 2007.

**(h) Factual and Legal Issues**.

**Plaintiff's Position**

Plaintiff brings this case under 26 U.S.C. § 6226 for redetermination of administrative adjustments to partnership items and the imposition of accuracy-related penalties. On December 15, 2005, the IRS issued the FPAA against the Partnership for the tax year ending December 27, 2000. The FPAA disallows all tax benefits arising from certain transactions described below (the "Transactions") and imposes accuracy-related penalties under 26 U.S.C. § 6662.

Plaintiff believes the FPAA adjustments and penalty determinations are improper, and therefore this Court should reject the FPAA and refund the Taxpayers' deposits.

The primary legal issues in this case are: (1) whether the Partnership and the Taxpayers correctly reported the tax consequences of the Transactions on their federal income tax returns, and (2) whether the Taxpayers' reliance in good faith upon the advice, counsel and guidance of qualified tax professionals, including, but not limited to, their long-time tax advisors at Ernst & Young, regarding the tax treatment of the Transactions was reasonable.

As a caveat, the following recitation of facts and issues reflects a summary overview of the material facts and issues in this case. Plaintiff reserves the right to amend, change, clarify or correct the facts and issues described below as the case progresses.

<u>Transaction Details</u>.

On April 14, 2000, the Taxpayers, through their wholly-owned limited liability companies, entered into certain over-the-counter, non-publicly traded European-style foreign currency option positions on the Euro and the Swiss Franc (collectively the "Options") with Deutsche Bank AG New York Branch. Each Taxpayer purchased a long option (the "Long Options") and sold a short option (the "Short Options").

On April 17, 2000, several months *before* the issuance of IRS Notice 2000-44, the Taxpayers each contributed their Options to the Partnership as contributions to capital, with the Partnership assuming the obligations underlying the Short Options on that date. On June 13, 2000, the Options terminated in accordance with their terms.

On December 5, 2000, the Taxpayers each contributed to the Partnership as a contribution of capital certain North Carolina municipal bonds (the "Bonds") that the Taxpayers held for investments purposes. The Taxpayers later contributed their Partnership interests to PSM, Inc., a

Delaware corporation classified as a Subchapter S corporation for federal income tax purposes (the "Corporation"). Consequently, the Partnership liquidated and dissolved as a matter of law, with the Bonds being distributed to the Corporation. The Corporation later sold the Bonds on December 29, 2000.

Tax Treatment of the Transactions.

The Corporation recognized and reported for federal income tax purposes a loss on the sale of the Bonds equal to $24,531,884. This loss was allocated among the Taxpayers on their respective Schedules K-1 for the 2000 tax year, and reported on their timely filed federal income tax returns for that year.

The Corporation's loss generally arose from the Taxpayers' and Partnerships' treatment of the Short Options. Taxpayers' long-time advisors at Ernst & Young advised, and Proskauer Rose LLP formally opined, that the Short Options do not constitute liabilities for purposes of 26 U.S.C. § 752. Based upon this advice and counsel, the Taxpayers did not reduce the adjusted basis in their respective partnership interests by the value of the Short Option. The Corporation ultimately acquired these adjusted bases, which contributed to the loss recognized on the sale of the Bonds.

IRS Adjustments Are Improper and Should Be Reversed.

The IRS disallowed all the tax benefits associated with the Transactions on various theories articulated in the FPAA. Each of these theories is erroneous and cannot form the basis of the adjustments proposed.

Primarily, both the Partnership's and the Taxpayer's treatment of the Short Options on their federal tax returns was proper. The Short Options do not constitute liabilities under 26 U.S.C. § 752, as interpreted by then-applicable regulatory and common law authorities. Alternatively, the value of the obligations underlying the Short Options was zero. Accordingly,

the Taxpayers' bases in their Partnership interests are not reduced under 26 U.S.C. § 752 upon the Partnership's assumption of the Short Options. Nor should the Taxpayers' bases in the Partnership be reduced or otherwise disallowed under any other provision of the Code.

Additionally, the Partnership and the Transactions pass muster under applicable judicial doctrines. The Taxpayers' long-time tax advisors at Ernst & Young presented the Transactions as sound and legal business investments that, in addition to possessing certain tax benefits, also possessed a real opportunity to make a significant profit. The Taxpayers formed the Partnership and entered into the Transactions based upon this understanding. Accordingly, the Partnership may not be disregarded—nor may any part of the Transactions be disregarded or recharacterized—on the basis that it was a sham, lacked economic substance, or possessed no non-tax business purpose.

Moreover, Defendant's challenges to the Transactions under 26 U.S.C. §§ 165 and 465 must fail. Neither provision applies to the Partnership; rather, such provisions apply, if at all, only to the Taxpayers, and would require the Court to make partner-level determinations. Because this Court's jurisdiction is limited to partnership-level determinations, the Court lacks jurisdiction to hear Defendant's challenges.

As previously mentioned, Plaintiff believes that the 752 Regulation and 701 Regulation are invalid and illegal. *See* ¶ (g), *infra*.

Finally, in the event any tax underpayment is ultimately determined, the Taxpayers are not subject to penalties under 26 U.S.C. § 6662 for the following reasons:

1) Any tax liability ultimately determined is not attributable to negligence or disregard of rules or regulations, any substantial understatement of income tax, or any substantial or gross valuation misstatement under Chapter 1 of the Code.

2) There was reasonable cause for such underpayment and the Taxpayers acted in good faith as contemplated by 26 U.S.C. § 6664(c)(1).

3) Any understatement ultimately determined is attributable to items for which the relevant facts were adequately disclosed on the Partnership's and the Taxpayers' federal tax returns or in a statement attached thereto, and there is a reasonable basis for the tax treatment of such items;

4) The Partnership and the Taxpayers reasonably believed that the tax treatment of Transactions by them was more-likely-than-not the proper treatment based upon the advice of their long-time advisors at Ernst & Young and the legal opinion issued by Proskauer Rose LLP, wherein the firm opined, on a more-likely-than-not basis, as to the federal income tax consequences of the Transactions, and the conclusions set forth in the opinion provided the bases for the manner in which the Transactions were reported for federal income tax purposes.

**Defendant's Position**

Nature of this Tax Shelter Strategy.

This case arises out of a complex abusive tax shelter strategy developed by the accounting firm of Ernst and Young, the Chicago law firm of Jenkens & Gilchrist, a Professional Corporation ("J&G") and Deutsche Bank AG ("DB"). The strategy was essentially based on the purchase by wealthy taxpayers of what were characterized as option contracts, but which in reality were nothing more than private wagering arrangements. The contracts were not sold on any exchange. The strategy called for the purchase of virtually perfectly purported offsetting currency positions, but which had no reasonable possibility of a profit in excess of the enormous fees on the transactions. These fees were based on a fixed percentage of the taxpayer's desired tax loss. The scheme was marketed under the name of Currency Options Bring Reward Alternatives, or "COBRA." E&Y recruited J&G to assist in the development and marketing of the strategy and also to prepare a legal opinion blessing the tax benefits on the transaction. E&Y and J&G recruited DB to serve as the financial counter party to the private wagering contracts. This scheme has resulted in taxpayers claiming billions of dollars in improper and illegal tax benefits.

During 1999 E&Y marketed some 15 COBRA transactions, which included the JZ Buckingham transaction which is already in litigation before this Court. Due to the increased scrutiny of tax shelter transactions by the IRS, at the end of 1999, E&Y decided that it would no longer market COBRA. Nevertheless, E&Y decided that it would still implement one more set of COBRA transactions in 2000, for which it had already signed engagement letters with the Murphy family. While E&Y continued to use DB as the financial counterparty for these transactions, it cut J&G out of the transaction and recruited the law firm of Proskauer Rose LLP to assist in the transaction and issue the boilerplate legal opinion which was to be used by the taxpayers as penalty protection. The facts of this case involve the Murphy COBRA transactions.

Summary of Facts as to The Marketing of the Strategy.

It appears, as with prior COBRA transactions, that E&Y presented the tax strategy to petitioners by the use of power point displays. However, in light of E&Y's decision that the COBRA transaction should no longer be marketed, it required the Murphys to sign additional releases, expressly stating that the Murphys were releasing E&Y from any liability should their COBRA transactions be found by the IRS.

At the beginning of the Power Point presentation, petitioners were required to sign a confidentiality agreement and were also not allowed to retain any of the marketing materials used by E&Y to explain the complex series of transactions.

As with the prior 1999 COBRA transactions, the fees to purchase the COBRA product were pre-set by the promoters as a percentage of the taxpayers' desired tax loss. E&Y allegedly recommended that participants not eliminate their entire income, so as to avoid flagging the transaction to the IRS. E&Y thereafter "picked" the loss plaintiffs needed to generate and the participants signed the form documents which were then generated to effectuate the transaction.

The Partnership was created as an integral part of the series of steps of the transaction which were necessary for purposes of generating the losses that had been "picked."

As detailed in the FPAA issued with respect to the Partnership for the tax year ending December 27, 2000, the Service disallowed, upon multiple grounds, the artificially inflated bases purportedly generated in the partnership. In addition to the grounds set forth in the FPAA, the United States also asserts various additional grounds for upholding the determinations set forth in the FPAA.

Relevant Factual and Legal Issues.

Plaintiff's complaint alleges that the following findings in the FPAA are erroneous:

1) The net loss from Form 4797 is $0.00 in lieu of the amount of ($738,000.00) as reported by the Partnership for short tax year ended December 27, 2000.

2) Ordinary dividends are $0.00 in lieu of the amount of $60.00 as reported by the Partnership for tax year 2000.

3) Net short-term gain is $0.00 in lieu of the amount of $11,560.00 as reported by the Partnership for tax year 2000.

4) Investment income is $0.00 in lie of $60.00 as reported by the Partnership for tax year 2000.

5) Tax-exempt interest income is $0.00 in lieu of $9,836.00 as reported by the Partnership for tax year 2000.

6) The Partnership's outside basis is disallowed in its entirety for tax year 2000.

7) Neither the Partnership nor its Partners have established the existence of the Partnership as a partnership as a matter of fact.

8) Even if the Partnership existed as a partnership, it was formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its Partners.

9) The formation of the Partnership, the acquisition of any interest in the partnership by the Partners, the purchase of offsetting options, the transfer

of offsetting options to the Partnership in return for a partnership interest, the purchase of assets by the Partnership, and the distribution of those assets to the Corporation, a corporation controlled by the Partners in complete liquidation of the partnership interests, and the subsequent sale of those assets to generate at a loss, all within a period of less than nine months, had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes.

10) The Partnership and the Transactions shall accordingly be disregarded in full and (1) any purported losses resulting from these Transactions are not allowable as deductions; (2) increases in basis of assets are not allowed to eliminate gain for federal income tax purposes.

11) The Partnership was a sham, lacked economic substance, and, under Treas. Reg. § 1.701-2, was formed and availed of in connection with a transaction or transactions in taxable year 2000, a principal purpose of which was to reduce substantially the present value of its Partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code.

12) The Partnership is disregarded and that all transactions engaged in by the Partnership are treated as engaged in directly by its Partners. This includes the determination that the assets purportedly acquired by the Partnership, including, but not limited to, the Options, were acquired directly by the Partners.

13) The Options contributed to or assumed by Partnership are treated as never having been contributed to or assumed by the Partnership and any gains or losses realized by the Partnership on the Options are treated as having been realized by its Partners.

14) The Partners of the Partnership should be treated as not being partners in the Partnership.

15) Contributions to the Partnership will be adjusted to reflect clearly the Partnership's or Partners' income.

16) The obligations under the Short Options (written call options) transferred to the Partnership constitute liabilities for purposes of Treas. Reg. § 1.752-6T, the assumption of which by the Partnership shall reduce the Partners' bases in the Partnership in the amounts of $11,640,000.00 for Harry D. Murphy, $6,111,000.00 for Marc D. Murphy, and $6,111,000.00 for Stratton K. Murphy, but not below the fair market value of the partnership interest.

17) Neither the Partnership nor its Partners entered into the Options or the investments in Foreign Currency or the Long and Short Term Shares with a profit motive for purposes of Code Section 165(c)(2).

18) Even if the Options are treated as having been contributed to the Partnership, the amount treated as contributed by the Partners under Code Section 722 is reduced by the contributing Partners from the contemporaneous sales of the Short Options to he same counter-party.

19) The basis of the Options is reduced, both in the hands of the contributing Partners and the Partnership. Consequently, any corresponding claimed increases in the outside basis in the Partnership, resulting from the contributions of the Options are disallowed.

20) The adjusted bases of the Long Options (purchased call options), and other contributions made by the Partners to the Partnership have not been established under Code Section 723.

21) The Partners of the Partnership have not established adjusted bases in their respective partnership interests in an amount greater than zero (-0-).

22) In the case of a sale, exchange, or liquidation of the Partnership, the Partners' partnership interests, neither the Partnership nor its Partners have established that the bases of the Partners' partnership interests were greater than zero for purposes of determining gain or loss to such Partners from the sale, exchange, or liquidation of such partnership interest.

23) The adjustments of partnership items of the Partnership are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there was no showing of reasonable belief by the Partnership or its Partners that the position taken was more-likely-than-not the correct treatment of the tax shelter and related transactions.

24) All of the alleged underpayments of tax resulting from the FPAA's adjustments of partnership items are attributable to, at a minimum: 1) Substantial understatements of income tax; 2) Gross valuation misstatements; or 3) Negligence or disregarded rules or regulations.

25) There has not been a showing by the Partnership or any of its Partners that there was reasonable cause for any of the resulting underpayments, that the Partnership or any of its Partners acted in good faith, or that any other exceptions to the penalty apply.

26) At a minimum, the accuracy-related penalty under Code Section 6662(a) applies to all underpayments of tax attributable to adjustments of partnership items of the Partnership, and the penalty should be imposed on

> the components of underpayment as follows: 1) A 40% penalty should be imposed on the portion of any underpayment attributable to the gross valuation misstatement as provided by Code Sections 6662(a), 6662(b)(3), 6662(e), and 6662(h); 2) A 20% penalty should be imposed on the portion of the underpayment attributable to negligence or disregard of rules and regulations as provided by Code Sections 6662(a), 6662(b)(1) and 6662(c); 3) A 20% penalty should be imposed on the underpayment attributable to the substantial understatement of income as provided by Code Sections 6662(a), 6662(b)(2), and 6662(d); and 4) A 20% penalty should be imposed on the underpayment attributable to the substantial valuation misstatement as provided by Code sections 6662(a), 6662(b)(3), and 6662(e).

Plaintiff also contends that Defendant bears the burden of proof in this matter, which Defendant denies.

Moreover, Defendant contends that the step transaction doctrine applies to this case, requiring that the individual steps of the COBRA transaction be collapsed. The purported partnership in this scheme was simply used as a conduit to create an artificially inflated basis in the purported partners' partnership interests, which inflated basis could, in turn, then be allocated to property distributed to the purported Subchapter S corporation upon the prearranged dissolution of the purported partnership. The purported Subchapter S corporation was also simply used as a conduit to generate a paper tax loss on the sale of this property whose basis had been artificially inflated, which loss could then be passed through to the individual taxpayers. Under the step transaction doctrine, the steps of the transfer of the offsetting options to the purported partnership and the distribution of the partnership property on the liquidation of the partnership to the purported subchapter S corporation are disregarded. With these steps disregarded, the basis of property distributed to the Subchapter S corporation would therefore be required to equal the actual cost of this property—and not the artificially inflated basis of the disregarded partnership interests. Thus, the disposition of such property would not give rise to an artificially—generated tax loss.

In addition, the United States contends that the offsetting option transactions may be factual shams. That is, it appears that while these transactions are, at least to some extent, documented on paper, this documentation may not reflect the reality of these transactions. Based on the allegations in various COBRA participants' suits against the COBRA promoters, these option contracts may ultimately be determined to be illusory.

Also, the United States contends that the "at risk" rules of I.R.C. § 465 apply here to preclude the allowance of the claimed losses. Section 465(a)(1) provides that the individuals may claim losses and deductions only to the extent of the aggregate amounts to which the taxpayer is at risk. Section 465(b) provides that a taxpayer is not considered at risk with respect to amounts protected against loss through some related agreement. In the COBRA transactions, the offsetting options were expressly designed to ensure that the investors, through their LLCs and their partnership, were exposed to risk only to the extent of the net premium paid to Deutsche Bank. Moreover, the operation of the offsetting options limited their risk because the values of the options moved in opposite directions in economically offsetting amounts. The amount that could be gained or lost was therefore fixed at the time that the offsetting came into existence. As neither the LLCs nor the Partnership were "at risk" for more than the amount of the net premium, Section 465 precludes the Partnership from claiming a basis in the offsetting option positions in excess of the net premium.

Additionally, IRC § 165(c) would bar any claimed loss deductions. Section 165 allows individuals to deduct losses from dispositions of property only to the extent that the losses are "incurred in a trade or business" or "incurred in any transaction entered into for profit." Under this statute, the individuals may deduct losses for an investment only if they can establish that they entered into the offsetting options transactions for profit. Indeed, a long line of authority

summarized in *Fox v. Commissioner*, 82 T.C. 1001, 1019-21 (1984), holds that the taxpayer must establish that the transaction was undertaken primarily for profit. Under Section 165(c)(2), in order for individual taxpayers to be entitled to loss deductions arising out of their investment in a partnership, they must have entered into the underlying partnership transactions primarily with a profit motive and, at the partner level, the individual taxpayers must have had a profit objective for investing in the partnerships. In this case, the evidence will show that the investors entered into the transactions with the objective of creating non-economic losses devoid of economic substance and with no reasonable expectation of profit. Because of the strategy's high transaction costs, the offsetting options' expected return was negative, a clear indication that the taxpayers were not seeking profits but rather tax benefits.

Finally, even if the Court were to decide that the offsetting transactions were not a single position, the closed transaction doctrine would negate the claimed non-economic losses because the partnership would recognize gain on the expiration of the sold short option. Moreover, the partners' outside basis, even if increased by the cost of the long option, would be reduced to zero at the expiration of the unexercised long option.

**(i) Settlement/ADR.**

Plaintiff is open to settlement offers and/or the following alternative dispute resolution ("ADR") methods described in the Special Order: settlement judge, third-party neutral, and mediation. Regarding the latter, Plaintiff believes *meaningful* ADR may be appropriate in this case, provided that Defendant participates in good faith and has a representative attending the ADR session that truly has authority to settle these cases without extended consultations with others in the government.

Defendant contends that this transaction was identified by the IRS in Notice 2000-44 as a potentially abusive tax shelter, subject to the imposition of penalties. Under IRS Notice 2002-2, the IRS announced that it would assert no penalties if, *inter alia*, the individual participants disclosed their participation in the transaction. In this matter, the individual participants failed to disclose their participation. Moreover, the individual participants elected not to participate in an IRS global settlement initiative. Under the IRS' global settlement initiative, the IRS offered to compromise penalties, but not tax. In light of global settlement initiative, Defendant believes this case is not susceptible to ADR.

**(j)** **Joint Proposed Scheduling Plan**. The Parties agree on the following:

1. **Requested Place of Trial**. Plaintiff requests that this case be tried in Dallas, Texas. Defendant requests that the case be tried in Washington, D.C.

2. **Anticipated Duration of Trial**. Plaintiff anticipates it will take five (5) days—one week—to try this case. Defendant anticipates it will take ten (10) days.

3. **Earliest Ready Date for Trial**. The earliest date by which the Parties expect to be ready for trial is January 2008.

4. **Deadline for Joining Additional Parties**. This will depend, to a great extent, on the Court's decision on whether this case should be consolidated with any other matter.

5. **Anticipated Filings of Dispositive Motions**. Although the Parties do not anticipate filing any motion that disposes of this case in full, Plaintiff intends to file a motion for partial summary judgment pursuant to RCFC 56 on the grounds that the 752 Regulation and 701 Regulation are invalid, as discussed in ¶ (g), *infra*.

6. **Phased or Limited Discovery**. The Parties do not believe discovery should be conducted in phases. Further, the Parties have agreed to coordinate discovery over all the Cases, including this case, consistent with the MDL court's order. *See* ¶ (d), *infra*. Pursuant to this agreement, each Party is limited to 100 interrogatories per Case and a total over all the Cases of 99 depositions. The Parties recommend that the Court adopt a discovery plan consistent with this agreement. At this time, the Parties do

not believe that any discovery above and beyond the discovery plan contemplated is necessary.

7. **Discovery Limitations**. *See* ¶ (d) and ¶ (j)(6) above.

8. **Deadline for Fact Discovery**. Fact discovery will be completed by August 1, 2007.

9. **Plaintiff's Expert Disclosure**. Plaintiff shall serve an expert witness list, accompanied by a written expert report prepared and signed by each expert witness, by May 1, 2007, and shall make its expert witnesses available for deposition at that time. Plaintiff shall serve any rebuttal expert reports by June 1, 2007.

10. **Defendant's Expert Disclosure**. Defendant shall serve an expert witness list, accompanied by a written expert report prepared and signed by each expert witness, by May 1, 2007, and shall make its expert witnesses available for deposition at that time. Defendant shall serve any rebuttal expert reports by June 1, 2007.

11. **Deadline for Expert Discovery**. Expert discovery will be completed by August 1, 2007.

12. **Physical or Mental Examinations**. Not applicable.

13. **Other Matters Pertinent to the Completion of Discovery**. Other than those matters referenced and discussed in ¶ (d), *infra*, the Parties are not aware of any other matters pertinent to the completion of discovery in this case.

**(k) <u>Electronic Case Management</u>.**

This case has been designated for the ECF program. Therefore, the Parties will be filing and serving all pleadings electronically as the Court has ordered. In addition, the Parties agree to produce documents to each other in usable electronic format.

**(l) <u>Other Information</u>.**

1. **Early Meeting of Counsel**. Undersigned counsel jointly represent that they held the early meeting of counsel as required in Appendix A ¶ 3 on September 19, 2006.

2. **Initial Disclosures**. The Parties intend to make initial disclosures pursuant to RCFC 26 on or before October 31, 2006.

3. **Any Other Additional Information**. The Parties do not believe there is additional information of which the Court should be aware at this time.

**(m) Status Conference**.

The Court has scheduled the status conference for October 4, 2006, at 11:00 a.m. EST.

**(n) Appendix**.

Acting in good faith while the Parties' Joint Motion to File Appendix to JPSR via CD-ROM and to File Certain Exhibits Under Seal was pending before this Court, the Parties submitted to the Court the Appendix to this JPSR via CD-ROM. Pursuant to this Court's Order dated September 21, 2006, the Parties resubmitted the Appendix to this JPSR in paper form on September 22, 2006. A copy of Plaintiff's exhibit list is attached hereto as Exhibit A, while Defendant's exhibit list is attached hereto as Exhibit B. The designation "Sealed" identifies those documents filed under seal because they reflect personal information.

Respectfully submitted,

**For Plaintiff**

By: s/Joel N. Crouch
Joel N. Crouch
Texas State Bar No. 05144220
M. Todd Welty
Texas State Bar No. 00788642
Michael E. McCue
Texas State Bar No. 13494150
Anthony P. Daddino
Texas State Bar No. 24036434

MEADOWS, OWENS, COLLIER, REED, COUSINS & BLAU, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202
Telephone: (214) 744-3700
Facsimile: (214) 747-3732
jcrouch@meadowsowens.com
twelty@meadowsowens.com
mmccue@meadowsowens.com
adaddino@meadowsowens.com

ATTORNEYS FOR PLAINTIFF PSM FARMS, LLC

**For Defendant**

By: s/Dennis M. Donohue by s/Joel N. Crouch
DENNIS M. DONOHUE
Senior Litigation Counsel
JOHN A. LINDQUIST
DAVID STEINER
Trial Attorneys

UNITED STATES DEPARTMENT OF JUSTICE – TAX DIVISION
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6561

ATTORNEYS FOR DEFENDANT UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

On this 27th day of September, 2006, a copy of the foregoing Amended Joint Preliminary Status Report was delivered to counsel listed below via electronic means.

Dennis M. Donohue, Esq.
John A. Lindquist, Esq.
David Steiner, Esq.
United States Department of Justice
Tax Division
Civil Trial Section, Northern Region
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044

s/Joel N. Crouch
Joel N. Crouch